UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
01 AUG -8 AM 11:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
AUG 8 2001

| | |
|---|---|
| JAMES GILLIAM, | } |
| Plaintiff, | } |
| v. | } CASE NO. CV 00-B-0874-S |
| BELLSOUTH TELECOMMUNICATIONS, INC., | } |
| Defendant. | } |

**MEMORANDUM OPINION**

Currently before the court is the Motion for Summary Judgment filed by defendant BellSouth Telecommunications, Inc. ("BellSouth" or "defendant"). The present action arises out of claims by plaintiff James Gilliam ("Gilliam" or "plaintiff") that his former employer, BellSouth, violated Title 1 of the American with Disabilities Act ("ADA"). Plaintiff also contends that BellSouth unlawfully retaliated against him for filing grievances regarding BellSouth's failure to promote plaintiff because of his disability. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's motion is due to be granted.

**I. FACTUAL SUMMARY**

Defendant originally hired plaintiff in a warehouse position in 1995. (James Gilliam ("Gilliam Depo.") at 32.) Plaintiff disclosed prior to his employment with defendant that he was diabetic. (Gilliam Depo. at 9.) Plaintiff also disclosed to defendant that he had a history of arrests relating to driving violations, and that he had been charged with the felony of criminal mischief. (Gilliam Depo. at 23-26.) After working in the warehouse for nine months, plaintiff

began working at the University of Alabama at Birmingham where he worked for four months. (Gilliam Depo. at 32.) In March 1997, defendant rehired plaintiff in its Unbundled Network Elements ("UNE") group as an Electronic Technician. (Gilliam Depo. at 33.)

In May of 1997, defendant sent plaintiff to Nashville to attend a course along with several co-workers. (Kay Gough ("Gough Depo.") at 72-74; Gilliam Depo. at 50.) One of his co-workers, Margaret Calger, ("Calger") complained that plaintiff sexually harassed her while in Nashville. (Gilliam Depo. at 50-55; Gough Depo. at 72-73.) After an investigation plaintiff received a warning. (Gilliam Depo. at Ex. 8.)

On June 3, 1998, plaintiff was disciplined for sending an email that contained the acronym "s.h.i.t.o.n." (Gilliam Depo. at Ex. 10; Gough Depo. at 61-62; DXII D.)[1] On April 10, 1998, plaintiff's supervisor, Kay Gough ("Gough"), attempted to set up a meeting between herself, Barry Gordon ("Gordon"), another one of plaintiff's supervisors, and plaintiff to discuss the inappropriate email. (Gough Depo. at 61, 64-65; DXII I at ¶ 4.) Plaintiff did not attend the meeting. (Gough Depo. at 62.) Plaintiff denies that he refused to meet with his supervisor, Gough, but admits that he left work early that day. (Gough Depo. at 69; PX 1.)[2]

Gough and her manager, Frank Batusic, ("Batusic") determined that plaintiff should be disciplined for the events of April 10, 1998. (DXII D.) Batusic and security manager Terry Lane ("Lane") waited in the building's lobby for plaintiff to arrive at work on Monday morning, April

---

[1] The acronym "s.h.i.t.o.n." stands for "supervisors hate intense tactics operations and negotiations." (Gilliam Depo. at Ex. 10.)

[2] Plaintiff submitted Exhibits to Plaintiff's Response to Defendant's Motion for Summary Judgment with attached exhibits. References to this evidence will be cited as "PX" followed by the corresponding exhibit number.

2

13, 1998, in order to escort him to a conference room for a disciplinary meeting. (DXII I at ¶ 4.)[3] Plaintiff was intercepted on the way into the building by Mike Green ("Green"), a job steward with the Communications Workers of America ("CWA"), to which plaintiff belonged. (DXII I at ¶ 5.) Green took plaintiff to the mental health facilities of Brookwood Hospital. (DXII I at ¶ 5.) Green later informed Batusic that plaintiff left the hospital against medical advice. (DXII I at ¶ 5.)

Medical personnel from Brookwood Hospital subsequently called an Employee Assistance Counselor with BellSouth, Alan Kennedy ("Kennedy"), to report that plaintiff had indicated that he might harm his supervisor, Gough. (DXII I at ¶ 6.) At this time, defendant organized a Threat Assessment Team consisting of Gough, Kennedy, Terry Spidle, and Batusic to consider the situation. (DXII I at ¶ 7.) On April 17, 1998, the Threat Assessment Team decided that plaintiff should not return to work until he received a fitness for duty evaluation. (DXII I at ¶ 7.) Batusic subsequently telephoned plaintiff to inform him that his fitness for duty needed to be evaluated, and that he was being temporarily placed on paid leave. (DXII I at ¶ 8.) During the conversation with Batusic, plaintiff yelled, cursed, and made inappropriate remarks to Batusic. (DXII I at ¶ 8.)

Concorde, Inc., an occupational health management company independent of BellSouth, handled plaintiff's fitness for duty evaluation. (Thomas Duttera ("Duttera Depo.") at 52.) As part of the evaluation, plaintiff was interviewed by psychiatrist Dr. Judith M. Bowen ("Bowen"),

---

[3] Defendant submitted Appendix to Defendant's Motion for Summary Judgment with attached exhibits. References to this evidence will be cited as "DXII" followed by the corresponding exhibit letter.

3

who concluded that while individual psychotherapy would benefit plaintiff, he was not suffering from a major psychiatric disorder and could return to work. (DXII B.) Plaintiff's case manager at Concorde, Barbara A. Hosteller ("Hostetler"), concurred in this determination and so informed BellSouth on June 2, 1998. (DXII C.) Like Bowen, Hostetler recommended that plaintiff undergo counseling. (DXII C.) Plaintiff attended two thirty-minute counseling sessions. (Gilliam Depo. at 14.)

Defendant allowed plaintiff to return to work on June 3, 1998. (DXII D.) During plaintiff's absence, Thomas Duttera ("Duttera") replaced Batusic as Gough's supervisor and thus as plaintiff's second level supervisor. (Duttera Depo. at 14.) Upon his return to work on June 3, 1998, plaintiff was immediately disciplined for the events of April 10, 1998: refusing to meet with Gough; leaving work without permission; behaving abusively toward Batusic on the telephone; and sending the inappropriate e-mail to Gordon. (DXII D; DXII I at ¶ 4.) BellSouth suspended plaintiff for eight days. (DXII D.) BellSouth also warned plaintiff that further misconduct would result in additional disciplinary action, up to and including discharge. (DXII D.)

In early 1998, plaintiff had begun actively seeking a promotion to a management position at BellSouth. (Gilliam Depo. at 57.) He did so primarily through BellSouth's CareerLINK program, whereby employees can apply for positions that are posted on BellSouth's internal computer intranet, which is available to all employees. (Gilliam Depo. at 57; Duttera Depo. at 43.) When a manager posts a management position on CareerLINK and becomes interested in a non-management candidate for the job, the manager can send the candidate through BellSouth's Access to Management program where that candidate's management potential is assessed.

4

(Duttera Depo. at 34-35.) An alternate route for promotion to management at BellSouth is for an employee's supervisor to recommend that the employee be sent through the Access to Management program. (Duttera Depo. at 34.) Plaintiff requested that Duttera send him through the Access to Management program. (Duttera Depo. at 37-38.) Plaintiff eventually complained to Amy Robb, ("Robb") BellSouth's Equal Employment Opportunity/ Affirmative Action manager, that he was being "blocked" from advancement, possibly on a discriminatory basis. (Gilliam Depo. at Ex. 11.)

Plaintiff's frustration over not being sent through the Access to Management program apparently began to mount. Plaintiff met with Robb and Duttera on January 7, 1999, to discuss his complaints. (DXII H at ¶ 6.) During the meeting, Robb explained that it was up to the manager selecting an individual for a job to determine the most qualified candidate. (DXII H at ¶ 6.)[4] Plaintiff became noticeably upset and began shaking. (DXII H at ¶ 6.) His voice became louder and eventually plaintiff stormed out of the meeting. (DXII H at ¶ 6.)

Plaintiff sent an email to Duttera on February 24, 1999, requesting that he be scheduled for BellSouth's Access to Management program and that Duttera provide him with feedback. (Gilliam Depo. at Ex. 6.) Plaintiff also sent an email to BellSouth Vice-President Jan Funderburg ("Funderburg") on February 11, 1999, requesting that he be sent through the Access to Management Program. (Gilliam Depo. at Ex. 7.) Funderburg responded on February 18,

---

[4] Defendant has taken the position that there are two ways to be sent through the Access to Management program: (1) an employee's supervisor can recommend the employee, or (2) a manager who posts a job vacancy can send the employee through the Access to Management program. (Duttera Depo. at 34-35.) In ruling on Defendant's Motion for Summary Judgment it is not necessary for the court to decide whether there are one or two avenues to the Access to Management program.

1999, and recommended that plaintiff discuss his prospects for entering the Access to Management program with his management team. (Gilliam Depo. at Ex. 7.) Duttera met with plaintiff on a number of occasions regarding plaintiff's interest in advancement, offered to interview plaintiff for an open management position in his center, and to provide plaintiff with feedback for developmental purposes in order to assist him in attaining his goals; plaintiff declined Duttera's offer. (Gilliam Depo. at Ex. 7; DXII H at ¶¶ 4-8.)

On March 10, 1999, some of plaintiff's coworkers complained to Gough and Duttera that plaintiff was acting strange, that plaintiff had been using profane language in a loud voice, and that they felt their safety was threatened. (Gough Depo. at 21-22; Duttera Depo. at 10.) A BellSouth employee told Gough that plaintiff had threatened to harm her. (Gough Depo. at 29-30.) Duttera decided that he needed to meet with plaintiff about this behavior, and asked Katie Weinstein ("Weinstein"), a representative of the CWA, to ask plaintiff to meet with the two of them. (Duttera Depo. at 19.) When Weinstein approached plaintiff, he was having lunch in a large conference room, along with many other BellSouth employees prior to attending a BellSouth presentation. (Duttera Depo. at 40; Gilliam Depo. at 60-62.) Plaintiff refused to meet with Weinstein and Duttera at that time. (Duttera Depo. at 20; Gilliam Depo. at 60-61.) After Weinstein informed Duttera of plaintiff's refusal, Duttera personally approached plaintiff and asked him to meet with them. (Duttera at 19-20.) Plaintiff again refused. (Duttera at 19-20.) Two other union representatives, Kathy Dease ("Dease") and Green, then joined Duttera in asking plaintiff to meet with Duttera and Weinstein. (Duttera Depo. at 20-21; Gilliam Depo. at 61.)

6

Plaintiff again refused; he also became agitated and left the conference room. (Gilliam Depo. at 65.) A few moments later, plaintiff reentered the conference room from another door and returned to his original seat. (Gilliam Depo. at 65.) At that point, Duttera contacted BellSouth Security Manager Terry Lane ("Lane"). (Duttera Depo. at 21.) After Duttera apprised Lane of the situation, Lane approached plaintiff, asked him to leave the conference room, and escorted him out of the building. (Duttera Depo. at 24.) Lane temporarily relieved plaintiff of duty and confiscated his ID badge. (Gilliam Depo. at 66.)

Thereafter, Duttera consulted with his boss, Bill Bolt, and with the Labor Relations Department, and made the decision to terminate plaintiff's employment. (Duttera Depo. at 57-58.) Plaintiff was terminated effective March 22, 1999, "for continued misconduct associated with failure to follow instructions and for continued unsatisfactory behavior." (DXII F.)

On May 18, 1999, plaintiff filed a charge of disability discrimination against BellSouth. On January 6, 2000, the EEOC issued a "Dismissal and Notice of Rights" regarding his charge, finding no cause to believe that defendant violated the ADA. (DXII G.) On April 5, 2000, plaintiff filed this instant suit. (*See* Compl.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine

issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

A. **Plaintiff's ADA Claim**

1. **Prima Facie Case**

The ADA prohibits "discriminat[ion] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims." *Hilburn v. Murata Electronics N. America, Inc.,* 181 F.3d 1220, 1226 (11th Cir. 1999). Under "pretext" analysis, the court is governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation*

*Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence).

Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant succeeds in carrying this burden, then the plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination or retaliation). *Burdine*, 450 U.S. at 253. A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs*, 106 F.3d at 1529; *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove the following elements: (1) that he has a disability; (2) that, with or without reasonable accommodations, he could perform the essential functions of his job; and (3) that he was discriminated against because of his disability. *Terrell v. U.S. Air,* 132 F.3d 621, 624 (11th Cir. 1998). Under the ADA, a person is considered disabled if he (1) suffers from a mental or physical impairment that substantially limits one or more of his major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2).

Plaintiff asserts that he meets the ADA standard for disability because he was regarded by defendant as being substantially limited in the major life activities of learning and working. (Pl.'s Brief at 8-9.) Plaintiff contends that Duttera's testimony that plaintiff "was terminated for unsatisfactory behavior and failure to follow instructions," and Gough's testimony that "[plaintiff] couldn't follow instructions," support his contention. (Pl.'s Brief at 9) (citing Duttera Depo. at 8; Gough Depo. at 11.) Plaintiff notes that defendant contends that plaintiff's problems following instructions were somehow related to belligerence or an uncooperative attitude. (Pl.'s Brief at 9.) However, plaintiff asserts that defendant actually believes that plaintiff's alleged problems following directions stem from a mental disorder. (Pl.'s Brief at 9.) Plaintiff further asserts that "[t]he fact that plaintiff applied for over 600 different jobs which were posted within the company only serves to bolster the argument that the Defendant perceived him as being mentally impaired to the point of his not being able to perform the life function of working." (Pl.'s Brief at 10; Gilliam Depo. at 56-57.) Plaintiff contends that defendant did not believe that plaintiff was incapable of handling just one job or even just one type of job, but believed plaintiff could not handle any of the jobs made available to other BellSouth employees. (Pl.'s Brief at 10.) Additionally, plaintiff notes Gough's testimony that plaintiff's co-workers said he was "bizarre," "strange," "weird," and "a nutcase." (Pl.'s Brief at 10; Gough Depo. at 69.)

As further evidence that defendant considered plaintiff disabled, plaintiff points to the fact that defendant had escorted plaintiff to Brookwood Hospital for counseling. (Pl.'s Brief at 11; PX 1 at unnumbered 1-2.) Green took defendant to Brookwood Hospital and tried to have him admitted to the psychiatric ward. (Gilliam Depo. at 61; PX 1 at unnumbered 1.) Plaintiff contends that if defendant did not perceive him as mentally disabled, then physically escorting

him and attempting to have him admitted to a psychiatric ward would not have been warranted. (Pl.'s Brief at 11.) Plaintiff also contends that defendant's requirement that he undergo a fitness for duty evaluation is further evidence that defendant perceived plaintiff as mentally disabled. (Pl.'s Brief at 11.)

The facts argued by plaintiff do not establish that defendant "regarded" plaintiff as disabled for purposes of the ADA. There are two ways in which an individual may invoke this statutory definition: (1) an employer mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual nonlimiting impairment substantially limits one or more major life activities. *Sutton v. United AirLines, Inc.,* 527 U.S. 471, 489 (1999). "In both cases, it is necessary that a covered entity entertain misperceptions about the individual – it must believe that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.* With respect to "perceived impairments," the Eleventh Circuit has observed: "As with real impairments, courts have held that a perceived impairment must be substantially limiting and significant. In this context, then, a significant impairment is one that is viewed by the employer as generally foreclosing the type of employment involved, not just a narrow range of job tasks." *Gordon v. E.L. Hamm & Assoc.,* 100 F.3d 907, 913 (11th Cir. 1996) (citations omitted). "The central theme . . . is that an employer[] [believes] that an employee can *not* perform his job." *Wilson v. Georgia-Pacific Corp.,* 4 F. Supp. 2d 1164, 1171 (N.D. Ga. 1998). In *Pouncy v. Vulcan Materials Co.,* 920 F. Supp. 1566, 1580 (N.D. Ala. 1996), the court held that defendant regarded the plaintiff as having a mental impairment where defendant suggested that the plaintiff obtain counseling. However,

11

the court held that the plaintiff had not shown her perceived impairment limited her employment generally, rather than just her particular job, and, therefore, plaintiff had not proven she was substantially limited in the major life activity of working. *See id.* at 1581.

Plaintiff has produced no evidence that he was perceived as being significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes. *See Hilburn v. Murata Electronics N. America, Inc.,* 181 F.3d 1220, 1230 (11th Cir. 1999) ("as with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual"). The evidence establishes that plaintiff was able to perform his duties without restriction. Plaintiff has not put forth sufficient evidence on which a reasonable jury could conclude that defendant "regarded" him as having an impairment that substantially limited a major life activity.

### 2. Legitimate, Nondiscriminatory Reason

Even if plaintiff had established a prima facie case of disability discrimination, defendant has articulated a legitimate, nondiscriminatory reason for the acts which plaintiff contends were discriminating. BellSouth has proffered evidence that plaintiff was not recommended for the Access to Management program because he did not display the appropriate qualifications. (Gough Depo. at 35; Duttera Depo. at 37-38.) Defendant asserts that it did not send plaintiff through management training because he did not display the appropriate qualities which BellSouth seeks in a manager. (Def.'s Brief at 19.) Plaintiff's supervisors, Gough and Duttera testified that a good manager requires the following qualities: good communication and interpersonal skills, the ability to motivate and develop others, decisiveness, and initiative. (Gough Depo. at 35; Duttera Depo. at 37.) Neither Gough nor Duttera felt that plaintiff's skills

in most of these areas were well-developed. (Gough Depo. at 35; Duttera Depo. at 37-38.) Defendant also contends that plaintiff's written communication skills were poor. (Def.'s Brief 19.) Further, Duttera received feedback that plaintiff was not an effective trainer. (Duttera Depo. at 39.)

An employee's lack of good communication skills constitutes a legitimate nondiscriminatory reason for declining to advance an employee. *See Grimes v. Texas Dept. of Mental Health and Mental Retardation,* 102 F.3d 137, 141 (5th Cir. 1996) (affirming summary judgment for employer who argued it declined to promote plaintiff because her oral and written communication skills were "relatively unsatisfactory"); *Johnson v. United States Dept. of Health and Human Servs.,* 30 F.3d 45, 47 (6th Cir. 1994) (affirming judgment for defendant on plaintiff's claim of failure to promote where defendant asserted that plaintiff's "technical, analytical, writing and communications skills were deficient").

With regard to plaintiff's termination, defendant has offered evidence that plaintiff was terminated because of repeated instances of misconduct. (DXII F.) Even if plaintiff could demonstrate that the *conduct* which resulted in his termination may have been the result of, or caused by, his disability his claims could not survive. *See Palmer v. Circuit Court of Cook County,* 117 F.3d 351, 352 (7th Cir. 1997) (termination for excessively disruptive behavior and threats is justified since "[t]he [ADA] does not require an employer to retain a potentially violent employee"); *Williams v. Widnall,* 79 F.3d 1003, 1006-07 (10th Cir. 1996) (an adverse action may properly be taken against a party because of an attribute caused by the handicap; employee was terminated not merely because of disability, but because he made threats against his supervisor and co-workers even when the actions were brought about as a result of the disability); *Newman*

*v. Chevron U.S.A.*, 979 F. Supp. 1085, 1092 (S.D. Tex. 1997) ("an employee may not 'bootstrap his disease into the line of causation' by showing that the misconduct relied upon by the employer was caused by the disability.") (quoting *Den Hartog v. Wasatch Academy*, 909 F. Supp. 1393, 1401 (D. Utah 1995)).

### 3. Pretext

Plaintiff has failed to establish that defendant's stated lawful reasons for the adverse actions at issue were a pretext for disability discrimination. Because plaintiff has failed to put forth sufficient evidence that defendant's legitimate non-discriminatory reasons for the employment decisions at issue were pretext for illegal discrimination defendant is entitled to judgment as a matter of law on his ADA claim.

**B.     Reasonable Accommodations**

In his complaint "[p]laintiff avers that the [sic] prior to and on March 19, 1999, the defendant failed and /or refused to accommodate the plaintiff further and allow the plaintiff to work." (Compl. at ¶ 25.) Discrimination under the under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). "[T]he burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). Once the plaintiff has met his burden of proving that reasonable accommodations exist, the defendant-employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer. *Willis v.*

*Conopco, Inc.*, 108 F.3d 282, 285-86 (11th Cir. 1997). Further, in order to make out a case for failure to accommodate, an ADA plaintiff must demonstrate that he or she actually demanded an accommodation. *See, e.g., Gaston v. Bellingrath Gardens and Home, Inc.,* 167 F.3d 1361, 1363 (11th Cir. 1999).

Plaintiff contends that defendant refused to accommodate his "request for Managerial Assessment through the built-in method by which they refer all employees who are being considered for a move to the Management ranks." (Pl.'s Brief at 13; PX 6.) Defendant does not dispute that it had notice of plaintiff's diabetes, but contends that it had no notice regarding how plaintiff's diabetes affected his job. Plaintiff has not proffered any evidence that he made specific reference to an "accommodation;" he did not make a request in writing or submit a request to the Personnel Department; he did not ask his psychiatrist or psychologist to contact defendant and construct an accommodation for him. In this case, while plaintiff may have made requests to enter the Access to Management program, plaintiff never participated in any effort to assist BellSouth in making the connection between his request and his alleged disability.

"[A]n ADA Plaintiff as one 'who is in the best position to know' what accommodation may be necessary, bears the burden of requesting the reasonable accommodation 'at the time the disability presents a problem on the job . . . .'" *Biggs,* 1998 WL 1069456 at *6 (N.D. Ala. 1998) (citing *Fussell v. Georgia Port Authority*, 906 F. Supp. 1561, 1569 (S.D. Ga. 1995), *aff'd* 106 F.3d 417 (11th Cir. 1997)). Summary judgment for the employer is proper where plaintiff fails to make an accommodation request. *See Fussell v. Georgia Ports Authority,* 906 F. Supp. 1561 (S.D. Ga. 1995); *see also Mears v. Gulfstream Aerospace Corp.,* 905 F. Supp. 1075 (S.D. Ga. 1995) (granting summary judgment for employer where plaintiff had failed to request a

15

reasonable accommodation during her employment). Plaintiff has failed to produce evidence which would allow a reasonable trier of fact to find BellSouth knew of any limitations arising out of plaintiff's alleged disability which would have required accommodation, and has failed to put forth evidence establishing that he requested an accommodation. Therefore, defendant is entitled to summary judgment on this claim.

**C.    Retaliation**

In his complaint plaintiff alleges that he was terminated for filing grievances regarding defendant's alleged unlawful failure to promote him because of his disability. (Compl. at ¶ 26.)[5] However, the only grievance plaintiff addresses in his brief is an email he sent to Duttera, which plaintiff contends is statutorily protected expression. (Pl.'s Brief at 20.) The ADA provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). This provision creates a prohibition on retaliation under the ADA analogous to Title VII's prohibition on retaliation. *See Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1281 (11th Cir. 1999); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Therefore, this court will assess plaintiff's retaliation claim under the same framework employed for retaliation claims under the Title VII.

In order to establish a prima facie case of retaliation under the ADA, plaintiff must establish that (1) he engaged statutorily protected expression; (2) he suffered an adverse

---

[5] Plaintiff's brief contends that the adverse employment action against plaintiff was that he was terminated. (Pl.'s Brief at 20.) Therefore, the court will only address the termination claim and will not consider whether defendant unlawfully failed to recommend plaintiff for the Access to Management program.

16

employment action; and (3) there was a causal link between his protected activity and the adverse employment action. *See Griffin,* 182 F.3d at 1281.

Plaintiff contends that the following email he sent to Robb constitutes statutorily protected activity:

> Dear Mrs. Robb
>
> According to Francis B. Semmes who is the house labor employment counsel for BST, you are my [point of contact] for EEOC complaints. Accessment [sic] to management as a criteria for advancement and a roadblock for advancement into management is my concern. James Thomas Duttera . . . refuses to send me to accessment
> [sic]. . . . I have not been considered for several positions and feel I have been blacklisted or left in the lurch by the previous matters I wrote to Mr. Duttera after he refused to send me to accessment [sic]. If this is the case, I need a point of contact so that my entire record can be reviewed by my lawyer . . . . If my record is clean, then yes, I have been discriminated against and your Acessment [sic] program . . . is a discriminatory barrier to advancement . . . .

(Pl.'s Brief at 20; *see* Gilliam Depo. at Ex. 11.) Plaintiff also contends that a casual connection exists between his engaging in a protected activity and his termination. (Pl.'s Brief at 21.) Defendant does not argue that plaintiff has failed to establish a prima facie case.[6] However, even assuming a prima facie case of retaliation under the ADA, defendant is entitled to judgment as a matter of law on plaintiff's claim that he was terminated in retaliation for engaging in protected activity under the ADA.

---

[6] Plaintiff was terminated on March 22, 1999. (DXII F.) Plaintiff did not file a charge of discrimination with the EEOC until May 18, 1999. Defendant could have made an argument that the email to Robb was not protected activity, and, therefore, plaintiff had failed to establish a prima facie case. However, because defendant does not make an argument that plaintiff failed to establish a prima facie case, the court will assume, without deciding, that plaintiff established a prima facie case of retaliation.

Defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's termination. Duttera testified that he terminated plaintiff because of his repeated instances of misconduct. (Duttera Depo. at 8.) Specifically, Duttera testified that plaintiff was terminated because he behaved inappropriately, failed to follow instructions, and, at times, he acted in a threatening manner toward his supervisors and co-workers. (Duttera Depo. at 9-11.) These constitute legitimate nondiscriminatory reasons for terminating plaintiff. *See Martinez v. United States Sugar Corp.,* 880 F. Supp. 773, 779 (M.D. Fla. 1995) (Violent behavior is a legitimate nondiscriminatory reason to terminate an employee.); *see also Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1288 (11th Cir. 1997) (noting that employers are not subject to liability for maintaining appropriate discipline in the work place even when the discipline is directed at a handicapped individual); *Poff v. Prudential Ins. Co.,* 911 F. Supp. 856, 861 (E.D. Pa. 1996) (concluding that a propensity for violent behavior is a legitimate, non-discriminatory explanation for discharge).

Plaintiff offers no evidence that defendant's legitimate, nondiscriminatory reason is pretext for unlawful retaliation. Therefore, the court is of the opinion that defendant is entitled to judgment as a matter of law as to this claim.

## IV. CONCLUSION

For the foregoing reasons, the court concludes that there is no genuine issue of material fact and that defendant is entitled to judgment as a matter of law. An Order in accordance with this Memorandum Opinion will be entered contemporaneously with this Opinion.

**DONE** this ___ day of August, 2001.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge